UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:16-cv-576-FDW

| | |
|---|---|
| WILLIE T. BOBBITT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| FNU SCOTT, et al., ) | |
| ) | |
| Defendants. ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment filed by Defendant Miranda Mims, (Doc. No. 61). Also pending are Plaintiff's Motion to Compel Discovery, (Doc. No. 60), and "Declaration for Entry of Default," (Doc. No. 65), which is construed as Motion for Default Judgment.

### I. BACKGROUND

The *pro se* incarcerated Plaintiff's Complaint passed initial review on claims of excessive force and failure to intervene against Lanesboro Correctional Institution Officers Vincent Scott and Norvell Gaddy, and against Security Risk Group ("SRG") Captain Miranda Mims for retaliation. Defendant Mims has now filed a Motion for Summary Judgment.

**(1)** **Complaint** (Doc. No. 1)

Plaintiff, who claims to have a history of mental health problems, alleges that and was in a cell on suicide watch in Lanesboro C.I.'s main medical unit on March 16, 2016, and he was released from suicide watch the following day. Defendant Scott came to Plaintiff's cell asking him to stop knocking on the door. Plaintiff repeatedly stated that he was no longer on suicide watch

1

and needed clothes and was ready to go back to his cell. Scott assaulted Plaintiff by saying "don't make me come in there." (Doc. No. 1 at 3).

A short time later, around 11:00 or 11:30 AM, Defendant Scott opened the food trap and sprayed Plaintiff and Plaintiff's cell with MK-9 pepper spray. (Doc. No. 1 at 4). Scott then told Gaddy to open Plaintiff's cell and he entered, which caused Plaintiff to fear for his safety. Scott continued to spray the entire can of MK-9 on Plaintiff as well as his personal mace, then punched Plaintiff's left eye twice. Plaintiff tried to cover himself with the suicide smock as Scott sprayed him. Plaintiff was never aggressive toward Scott or himself and did nothing to provoke the type of force that Scott used. During the assault Scott was yelling "I should kill you." (Doc. No. 1 at 4). Defendant Gaddy watched the assault and did nothing to stop it. Plaintiff received a red swollen left eye, loss of vision and bruises, and received no medical treatment. As a result of the incident, Plaintiff fears for his life, has problems sleeping, and experiences stress, depression and anxiety. Plaintiff sent numerous mental health requests yet received no help.

Plaintiff told Defendant Gaddy that he was going to write to his mother and newspapers about being assaulted, and Gaddy said he would report it to Mims. Mims retaliated by rejecting Plaintiff's outgoing mail that was sealed for no justifiable reason, which caused Plaintiff to become depressed and stressed. Mims had never rejected Plaintiff's outgoing mail until Plaintiff said that he was going to write to his mother and newspapers about the assault. Plaintiff is not a threat to the prison and is not a Security Threat Group ("STG") member so rejecting his sealed outgoing mail is unjustifiable and retaliatory. Plaintiff has serious family issues and he is not sure if his loved ones are getting his mail, this is causing him stress and worry.

Plaintiff seeks declaratory judgment, injunctive relief, compensatory and punitive damages, and such other relief to which he is entitled.

**(2)** **Defendant Mims' Motion for Summary Judgment** (Doc. No. 61)

Defendant Miranda Mims argues that she should be granted summary judgment because she did not violate Plaintiff's constitutional rights, about which there is no genuine dispute of material fact, and that she is entitled to qualified immunity and sovereign immunity.

Plaintiff's allegation that Mims unjustifiably blocked his outgoing mail in retaliation for his excessive force claims against Scott and Gaddy, and intent to write to a newspaper and his mother about the incident, is refuted by the record. Department policy that prohibits sealed outgoing mail by inmates who are either validated as SRG members or associates, which is reasonably related to the penological interest of maintaining the safety and security of the prison. Mims first blocked Plaintiff's sealed outgoing mail months before the alleged use of force incident, and Plaintiff's mail was only blocked because it was sealed and he was designated as a suspected associate of an SRG. Plaintiff's contention that the blocking only happened after the use of force incident is blatantly contradicted by the record and should not be adopted. Plaintiff can present no credible evidence upon which any reasonable juror could return a verdict in his favor. There are no genuine issues as to any material fact and Mims is entitled to judgment as a matter of law.

Mims' conduct was objectively reasonable in light of the circumstances so, even if Plaintiff could establish a constitutional violation, which he cannot, she is entitled to qualified immunity. Mims acted in accordance with Department policy and rejected Plaintiff's mail because he was identified as a suspected SRG associate and attempted to send sealed mail. On this evidence, no reasonable jury could find that Mims' conduct violated a clearly established constitutional right.

Any claims against Mims in her official capacity are barred by the Eleventh Amendment so they should be dismissed with prejudice.

**(3)** **Plaintiff's Response** (Doc. No. 66)[1]

Plaintiff argues that the Motion for Summary Judgement should be denied because genuine disputes of material fact exist with regards to Mims' actions. Mims unjustifiably blocked Plaintiff's outgoing mail in retaliation to keep him from letting his family and newspaper know that he was assaulted.

Plaintiff has been in and out of prison since 1999 and never had any problems with outgoing mail; he "always sealed [his] outgoing mail and continue[s] to seal [his] outgoing mail." (Doc. No. 66-2 at 2). Plaintiff denies being an SRG member as alleged by Mims. When Plaintiff asked Mims to prove that he was a SRG offender, "defendants stated they have no knowledge of the document and do not possess it." (Id.).

In 2013, some "religious writing" was taken from Plaintiff as Alexander C.I. (Id.). Plaintiff was placed on a "watch list" but the religious writing "was not gang related." (Id.). Plaintiff has "never pose[d] a threat to no prison [he has] been too, never tried to escape or get drugs into the prison." (Id.). Plaintiff has been on the watch list since 2013 "and it's yet to be verified [that Plaintiff] is a gang member or not." (Id.). Plaintiff denies being a gang member. He claims that the only people who cannot seal their mail in prison are the people who have been "violated and are level 1, 2, or 3." (Id.). Plaintiff is not any of those, was never written up for violating a prison rule, and does not fall under that policy.

Plaintiff claims that "[t]here is nothing in the prison policy or SOP stating that [Plaintiff] cannot seal [his] outgoing mail." (Id. at 3). "Out of all the years [Plaintiff has] been in prison soon as [he got] assaulted [he got] denied the right to reach out to people for help." (Id.). Because of

---

[1] The Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of the importance of responding to Defendant's Motion and the applicable legal standard. (Doc. No. 64).

Mims' actions, Plaintiff "was stressed and feared for [his] safety." (Id.). If Plaintiff "would have never been assaulted and told the defendant Gaddy that [he] was going to write the news and family [his] mail would have never been rejected." (Doc. No. 66 at 4).

**(4) Evidence**[2]

    **(A) Affidavit of Miranda Mims** (Doc. No. 62-1)

At the relevant times Defendant Mims was the Security Risk Captain at Lanesboro C.I. (Doc. No. 62-1 at 1). As Security Risk Captain, Mims monitored SRGs and their suspected and confirmed members or associates "in an effort to protect the safety of the inmates and staff at Lanesboro Correctional Institution." (Doc. No. 62-1 at 1).

The Department's use of mail policy "allows certain limitations on incoming and outgoing mail where there is a reasonable belief that such limitation is necessary to protect public safety or institutional order and security." (Doc. No. 62-1 at 2). "The use of mail policy provides for the inspection of incoming and outgoing mail in order to prevent the receiving or sending of material that threatens to undermine the security and order of the facility or mail that contains contraband or other unlawful materials." (Doc. No. 62-1 at 2). In an effort to protect the safety of the inmates and staff at Lanesboro C.I.:

> [T]he outgoing mail of inmates that are either validated or suspected of being a SRG member of associate is screened, and therefore must be unsealed. Therefore, inmates that are either validated or suspected of being a SRG member or associate are not permitted to send outgoing mail that is sealed. If an inmate that is either validated or suspected of being a SRG member or associate attempts to send outgoing mail that is sealed, that mail is rejected and archived at the facility. In the event outgoing mail is rejected because it was sealed and sent by an inmate that is either validated or suspected of being a SRG member or associate, that inmate is notified of the rejection by written memorandum.

(Doc. No. 62-1 at 2).

---

[2] This section is not exhaustive.

Upon admission at Lanesboro, if an inmate has already been designated in the Offender Population Unified System ("OPUS") as either validated or suspected member or associate of an SRG, the inmate is verbally informed of the prohibition on sealed outgoing mail. (Doc. No. 62-1 at 3). After the initial notification of the prohibition on sealed outgoing mail, if an inmate attempts to send sealed mail, he is notified via written memorandum that his outgoing mail has been rejected. All rejected mail is then archived at the facility.

Plaintiff was housed at Lanesboro twice, most recently from May 20, 2015 through February 8, 2017. (Doc. No. 62-1 at 3). In late May 2016, when Plaintiff was most recently admitted to Lanesboro, "his OPUS records indicate that since 2013, after being found to be in possession of certain written materials which are consistent with the teachings and belief of a particular SRG, he was identified as a suspected associate of a particular SRG. Accordingly, on or about May 20, 2016, because [Plaintiff] was already identified as a suspected SRG associate, during processing into Lanesboro, he was informed of the prohibition on sending sealed mail. Thereafter, on five separate occasions, [Plaintiff] attempted to send out sealed mail…. Each time [Plaintiff] attempted to send out sealed mail, the mail was intercepted, rejected, and archived. Each time [Plaintiff] attempted to send out sealed mail, he was advised, by written memorandum, that his outgoing mail had been rejected." (Doc. No. 62-1 at 3).

While Mims was the Security Risk Captain at Lanesboro, she "did not reject any of [Plaintiff's] outgoing mail in retaliation for any reason, including, claims of excessive force and failure to intervene, or his desire to write to a newspaper or his mother about the incident claim he made, including his claims of excessive force and failure to intervene against Correctional Officers Scott and Gaddy." (Doc. No. 62-1 at 3-4).

While Mims was Security Risk Captain at Lanesboro, "[Plaintiff's] mail was only rejected

because it was sealed and [Plaintiff] had been identified as a suspected SRG associate." (Doc. No. 62-1 at 4).

While Mims was Security Risk Captain at Lanesboro, she "acted in accordance with the Department's policy regarding inmates' use of mail." (Doc. No. 62-1 at 4).

Mims had no involvement in the use of force incident alleged in the Complaint and was not the direct supervisor of, and had no control over, Officers Scott or Gaddy. (Doc. No. 62-1 at 4).

**(B)** **Plaintiff's Affidavit** (Doc. No. 67-1)

Plaintiff's "religious" writings were taken for "SRG review" in 2013 while Plaintiff was incarcerated at Alexander C.I. However, "It was determined that it was not SRG writing but [Plaintiff] was placed on the watch list for 5%." (Doc. No. 67-1 at 1). This was the beginning of the defamation of his character but he did not have a problem with his outgoing mail. Upon his admission to Lanesboro, Plaintiff "was not informed of the prohibition on sealing outgoing mail." (Doc. No. 67-1 at 3).

Plaintiff filed a Complaint naming Scott, Gaddy, and Mims for the assault on March 17, 2016. Plaintiff "never had a problem with [his] mail until after the assault." (Doc. No. 67-1 at 2). Mims had nothing to do with the assault. (Doc. No. 67-1 at 2).

Plaintiff writing to his mother, Valerie Stanberry, posed no threat to the security of the prison and "if [his] letter was suspected of containing contraband [he] would have been asked to open the mail in front of someone for inspection, which didn't happen." (Doc. No. 67-1 at 2).

Plaintiff has never been under any type of investigation for posing a threat to the security of the prison or misused the phone or mail that contains contraband and "pose[s] no threat to the prison system." (Doc. No. 67-1 at 1). When Plaintiff was in prison he "was never involved in no

7

type of gang activity." (Doc. No. 67-1 at 2)

Mims said that Plaintiff was already identified as a suspected SRG associate but there is nothing in the use of mail policy stating that a suspected SRG associate cannot seal their mail. "The only reason that defendant Mims rejected [his] outgoing mail is to protect her co-workers." (Doc. No. 67-1 at 3).

In her Motion for Summary Judgment, Mims admits that the record establishes as a matter of law that she violated Plaintiff's constitutional or other rights.

Mims is not entitled to sovereign or qualified immunity because she was acting under the color of law and her conduct violated statutory and constitutional rights that a reasonable person would have known.

**(C)** **NCDPS Policy & Procedure**[3] (Doc. No. 62-2)

The NCDPS Policy & Procedure addressing Inmate Use of Mail provides that there is "no limit on the length, language, content, or source of mail for any inmate except when there is reasonable belief that limitation is necessary to protect public safety or institutional order and security." (Doc. No. 62-2 at 2).

The Facility head may provide for the inspection of outgoing mail which "shall serve to prevent the inmate from receiving or sending through the mail any material that threatens to undermine the security and order of the facility or mail that contains contraband or other material which cannot be lawfully sent through the mail." (Id. at 5). Personal mail is "read, censored, or rejected based on legitimate institutional interests of order and security." (Id.).

**(D)** **Time Line** (Doc. No. 62-3)

2013            Alexander C.I. Incident:

---

[3] Plaintiff has filed as an exhibit Lanesboro C.I.'s Standard Operating Procedure regarding Inmate Use of the Mail, (Doc. No. 67-1 at 7), which appears identical to the NCPLS Policy & Procedure regarding inmate use of mail.

8

|  |  |
|---|---|
| | Per Plaintiff: "Religious writings" were taken from Plaintiff; it was determined it "was not SRG writing" (Doc. No. 67-1 at 1) |
| | Per Mims: Plaintiff was identified as a "suspected associate of a particular SRG" (Doc. No. 62-1 at 3) |
| 5/20/15 | <u>Plaintiff arrives at Lanesboro C.I.</u> (Doc. No. 62-1 at 3) |
| 6/3/15 | <u>Memorandum re Unsealed Mail</u> from Mims to Plaintiff: "Please be advised that this Department received a letter that was not unsealed. This is to advise you that your letters will be rejected if this action is to occur again. You will be notified via memo as to your mail being rejected." (Doc. No. 62-3 at 1) |
| 1/26/16 | <u>Memorandum re Unsealed Mail</u> from Mims to Plaintiff: "Please be advised that this Department received a letter that was not unsealed. This is to advise you that your letters will be rejected if this action is to occur again. You will be notified via memo as to your mail being rejected." (Doc. No. 62-3 at 2) |
| 3/17/16 | <u>Alleged use of force</u> by Defendants Gaddy & Scott (Doc. No. 1 at 3) |
| 4/20/16 | <u>Memorandum re Unsealed Mail</u> from Mims to Plaintiff: "Please be advised that this Department received a letter that you were sending out to MIM Prisons that was sealed. Be advised that you received a memo on June 3, 2015 and January 26, 2016 that advised you that if action occur again it will be rejected, therefore this letter will not be sent out due to it being sealed." (Doc. No. 62-3 at 3) |
| 4/29/16 | <u>Memorandum re Unsealed Mail</u> from Mims to Plaintiff: "Please be advised that this Department received letters that you were sending out to Valerie Stanberry, and Michael Stanberry that was sealed. Be advise that you received a memo on June 3, 2015 and January 26, 2016 that advised you that if action occur again it will be rejected, therefore these letters will not be sent out due to being sealed." (Doc. No. 62-3 at 4) |
| 5/2/16 | <u>Memorandum re Unsealed Mail</u> from Mims to Plaintiff: "Please be advised that this Department received letters that you were sending out to Anne Blythe that was sealed. Be advise that you received a memo on June 3, 2015 and January 26, 2016 that advised you that if action occur again it will be rejected, therefore these letters will not be sent out due to being sealed." (Doc. No. 62-3 at 5) |

## II. LEGAL STANDARDS

**(1)** **<u>Summary Judgment</u>**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Although the court does not make a credibility determinations on summary judgment

review, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Smith v. Ozmint, 578 F.3d 246, 254 (4th Cir. 2009)) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).

**(2)  Retaliation**

The First Amendment right to free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercising that right." Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000); see Am. Civil Libs. Un. of Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."). Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir.1978). To succeed on such a claim, a plaintiff must establish: (1) his or her speech was protected; (2) the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech; and (3) a causal relationship exists between the speech and retaliatory action. Suarez, 202 F.3d at 686; see also Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); Wicomico Cnty., 999 F.2d at 785; Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990). In the prison context, such claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams, 40 F.3d at 74.

**(3)  Sovereign Immunity**

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth

Amendment to override that immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. Bright v. McClure, 865 F.2d 623, 626 (4th Cir. 1989) (citing McConnell v. Adams, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(4) Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

13

[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

### III. DISCUSSION

**(1) Retaliation**

It is undisputed that NCDPS's Policy & Procedure and Lanesboro C.I.'s SOP allow limitations on inmate mail where there is a "reasonable belief that such limitation is necessary to protect public safety or institutional order and security," (Doc. No. 62-1 at 2), and that mail can be inspected "in order to prevent the receiving or sending of material that threatens to undermine the

security and order of the facility or mail that contains contraband or other unlawful materials," (Id.). The parties agree that there was some incident in 2013 with regards to Plaintiff's SRG status, but they disagree about whether Plaintiff was determined to be an SRG associate. Mims and Plaintiff also disagree about whether Plaintiff was informed of the prohibition on sealing outgoing mail and whether Mims began rejecting Plaintiff's outgoing mail before or after the use of force incident.

The Court cannot make a credibility determination regarding whether Mims or Plaintiff is correct about his status as a suspected SRG associate. However, that factual dispute is not determinative because the record conclusively refutes Plaintiff's claim of retaliation. The unrefuted evidence shows that Plaintiff arrived at Lanesboro on May 20, 2015, Mims rejected Plaintiff's outgoing mail on June 3, 2015, and January 26, 2016, because they "w[ere] not unsealed," and that both of these rejections occurred before the use of force incident on March 17, 2016. (Doc. No. 62-1 at 3); (Doc. No. 62-3 at 1-2). Plaintiff's contentions that he was never notified that mail must be unsealed, and that Mims only began rejecting sealed mail after the use of force incident, are blatantly contradicted by the record such that no jury could accept them. See Smith, 578 F.3d at 254.

Plaintiff has thus failed to demonstrate the existence of a genuine dispute of material fact with regards to the causation element of his retaliation claim and Mims' Motion for Summary Judgment will be granted.

**(2)** **<u>Sovereign Immunity</u>**

Plaintiff seeks compensatory and punitive damages against Defendant Mims in her official capacity, however, this is barred by sovereign immunity. See <u>Almone</u>, 478 F.3d at 106; <u>Hutto</u>, 773 F.3d at 549. Therefore, Defendant Mims' Motion for Summary Judgment for damages is granted

on that basis.

**(3)** <u>**Qualified Immunity**</u>

Defendant Mims argues that qualified immunity shields her from damages in her individual capacity because Plaintiff has not established a constitutional violation and her actions were reasonable under the circumstances.

Defendant Mims explains that she believed, based on Plaintiff's OPUS report, that he was a suspected SRG associate and thus prohibited by NCDPS Policy from sealing outgoing mail, in the interest of safety and security. Defendant Mims' conduct did not violate a clearly established constitutional right of which a reasonable person would have been aware under these circumstances. <u>See</u> <u>generally</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1999) (qualified immunity is to be granted where officials have acted reasonably but mistakenly).

Therefore, Defendant Mims is entitled to qualified immunity and her Motion for Summary Judgment is also granted on that basis.

**IV.   PENDING MOTIONS**

**(1)** <u>**Motion to Compel**</u> (Doc. No. 60).

Plaintiff filed a Motion to Compel Discovery dated March 23, 2019 and docketed March 29, 2019. He seeks an Order compelling Defendants to "produce for inspection and copying the requested written deposition." (Doc. No. 60 at 1). He claims that he submitted a written request for these documents on February 4, 2019, and that it was filed with the Clerk on February 14, 2019, but he has not yet received the documents. He seeks an order requiring Defendants to pay $150 "as reasonable expenses in obtaining this order on the production of documents has no substantial justification." (<u>Id.</u>).

The court has "wide latitude in controlling discovery and … [t]he latitude given the district

courts extends as well to the manner in which it orders the course and scope of discovery." <u>Ardrey v. United Parcel Service</u>, 798 F.2d 679, 682 (4th Cir. 1986). A scheduling order may be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Good cause" means that "scheduling deadlines cannot be met despite a party's diligent efforts." <u>Dilmar Oil Co. v. Federated Mut. Ins. Co.</u>, 986 F.Supp. 959, 980 (D.S.C. 1997) (citations omitted). In deciding whether additional discovery is appropriate, courts have considered the following factors: whether trial is imminent; whether the request to reopen discovery is opposed; whether the non-moving party would be prejudiced; whether the moving party was diligent during the discovery period; the foreseeability of the request based on the time line set forth by the court; and the likelihood that the discovery will lead to relevant evidence. <u>See</u> <u>Smith v. United States</u>, 834 F.2d 166, 169 (10th Cir. 1987); <u>Chester v. Adams Auto Wash, Inc.</u>, 2015 WL 9222893 at *2 (E.D.N.C. Dec. 17, 2015).

Plaintiff filed his Motion to Compel after the discovery cutoff period and therefore essentially asks the Court to reopen discovery. However, Plaintiff has failed to demonstrate that he acted with due diligence or that the discovery will likely lead to relevant evidence. The Motion also fails to comply with the applicable procedural rules. <u>See</u>, <u>e.g.</u>, Fed. R. Civ. P. 37(a) (requiring certification that the movant attempted to confer with the opposing party in good faith). Finally, the Motion is also too vague and conclusory to support relief; Plaintiff has not attached the February 14 discovery request to his Motion and he refers to a docket entry that does not appear in the record. Therefore, Plaintiff's Motion to Compel will be denied.

**(2)** **<u>Motion for Default Judgment</u>** (Doc. No. 65)

Plaintiff's "Declaration for Entry of Default" is liberally construed as a Motion for Default Judgment. He appears to argue default judgment should be entered in his favor because Defendants failed to respond to his his February 14, 2019 discovery request.

The Court has already determined that the Motion to Compel cannot support relief. Therefore, the Motion for Default based on the alleged discovery violation also fails and Plaintiff's Motion for Default Judgment will be denied.

## V. CONCLUSION

Based on the foregoing, Defendant Mims' Motion for Summary Judgment is granted, Plaintiff's Motion to Compel Discovery is denied, and Plaintiff's Motion for Default Judgment is Denied.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Mims' Motion for Summary Judgment, (Doc. No. 61), is **GRANTED**.

2. Plaintiff's Motion to Compel Discovery, (Doc. No. 60), is **DENIED.**

3. Plaintiff's Declaration for Entry of Default, (Doc. No. 65), is construed as a Motion for Default Judgment and is **DENIED**.

4. The Clerk of Court is instructed to terminate this action as to Defendant Mims.

Signed: May 3, 2019

Frank D. Whitney
Chief United States District Judge